Syllabus.

23  340
28  177
28  218
29  524
23  340
31    9
31  175
31  209
31  309
32  552
23  340
33  288
23  340
35  455
36  125
36  247
36  532
37  484
37  485
37  624
39  259
39  298
39  300
39  545

No. 5445.

## P. H. Hennessy v. The State.

1. CONTINUANCE—DILIGENCE.—Defendant was indicted on March 17, and his trial was set for the twentieth of the ensuing April. On the eleventh day prior to said day of trial he sued out a writ of attachment for a witness who resided in a distant county, and the return on the writ shows that the witness had removed to the District of Columbia before the writ reached the officer's hands. No further effort was made to obtain the witness's attendance or testimony. *Held*, that these facts fail to show such diligence as entitled the defendant to a continuance, inasmuch as it does not appear that the attendance of the witness could not have been secured by a more prompt procurement of the attachment, nor that his testimony could not have been obtained by deposition.

2. EVIDENCE.—CONTINUANCE is properly refused when it is apparent that the desired testimony, if adduced, would be neither relevant nor material to the issue in the case.

3. SAME—CASE STATED.—Being indicted for forgery by alteration of an authenticated account against the State for postage stamps, etc., furnished to State senators, the accused (who was sergeant at arms) applied for a continuance to obtain the testimony of certain senators that they received the amount of stamps, etc, charged against them by the accused. *Held*, that such proof had no relevancy to the issue in the case, and would neither be material nor admissible at the trial.

4. FORGERY—VARIANCE.—Mere misplacement of the dot belonging to the letter "i" in setting out a proper name, plainly written, in an indictment for forgery, does not constitute a variance. See the opinion of the court in illustration.

5. SAME.—Indictment for forgery alleged that the account in question was approved by "H. Knittel, chairman on the committee on contingent expenses of the senate." The instrument was signed "H. Knittel, chairman on Com. Contg. Exp." *Held*, that the discrepancy was not a variance, and it was a question of fact whether the signature was an approval of the account, as was alleged by the indictment.

6. SAME.—An indictment for forgery need not, in setting out the forged instrument, take any notice of writing put upon the instrument subsequent to the forgery. Such writing is no part of the instrument, nor of its description.

7. PROOF OF INTENT BY COLLATERAL FACTS.—In a trial for forgery by alteration of an account against the State for postage stamps, etc., the prosecution was permitted, over objection, to put in evidence certain postoffice receipts for disbursements made by the defendant for stamps, etc., about the time of the alleged forgery, and was also permitted to adduce evidence that the amounts of said receipts had been altered. **The**

jury were instructed that they could not consider this evidence as any proof that the alleged alteration was made by the defendant, but only with reference to his intent, if in fact the alteration was made by him. *Held*, that the postoffice receipts were properly admitted as evidence on the question of intent, and for the purpose expounded to the jury.

8. SAME.—The prosecution was further allowed to adduce evidence tending to prove that the defendant had not purchased and distributed the quantity of postage stamps, etc., charged in his accounts against the State. *Held*, competent evidence of a fraudulent intent and a systematic falsification of a number of accounts which comprised the one involved in the charge of forgery on trial.

9. PRACTICE.—The manner of introducing evidence is largely left to the discretionary control and regulation of the trial court, and rulings thereon will not be revised on appeal when no abuse of that discretion to the defendant's prejudice is apparent.

10. SAME.—BILL OF EXCEPTIONS, to be available on appeal, should set forth the facts relevant to the ruling excepted to. The judge's authentication of the bill does not establish the validity of its grounds of exception, but merely certifies its presentation and the court's disposition of it.

11. FORGERY—FACT CASE.—Note evidence *held* amply to sustain a conviction for the forgery of an account against the State by altering and augmenting the amount for which the account had been approved.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

A term of two years in the penitentiary was the penalty imposed on the appellant by the jury, upon his conviction for forgery by altering a written account literally against "The Senate Chamber of the Twentieth Legislature," but in effect against the State of Texas.

The indictment sets out the account as it was before the alteration, and also as it appeared after the alteration; the only difference being that in its unaltered condition it called for one hundred dollars, and in its altered condition for one hundred and fifty dollars. In its altered condition as set out in the indictment, it reads as follows, omitting vignette, etc.:

"AUSTIN, Feby. 11, 1887.

The Senate Chamber of the 20th Legislature,

To P. H. HENNESSY, Sgt. at Arms.

To Stamps, Wrappers & Postal Cards furnished to

Senators ........................................ $150 00

I certify this bill correct.

P. H. HENNESSY, Sgt. at Arms.

H. KINTELL, Chairman on Com. Contg. Exp.

Approved,          T. B. WHEELER, Lieut. Governor."

(The misplacement of the dot of the letter "i" in the above spelling of the name "Knittel" raised the question of variance noticed in the fourth head note.)

T. B. Wheeler, the first witness for the State, testified that he was Lieutenant Governor of Texas, and knew the defendant, who was sergeant at arms of the senate of the Twentieth Legislature of the State of Texas. Witness approved accounts for defendant as sergeant at arms, and being shown an account, said that he had approved it. He recollected his approval of but one of defendant's accounts for the sum of one hundred and fifty dollars. Accounts, when approved for defendant, were returned to him by witness. . Defendant would bring his accounts, and witness required that they should be approved by Knittel, chairman of the committee on contingent expenses, and that the defendant should certify them to be correct. Upon such form the witness would approve the voucher, and return it to the defendant. All of defendant's accounts were presented to witness thus certified, and, when approved by him, he returned them to the defendant. These transactions occurred in Travis county, Texas. Witness supposed the date of the account in question (February 11, 1887) was correct. Witness never authorized any change to be made in said account.

Cross examined, the witness said that he identified the account only by his signature to it. He did not remember approving two accounts aggregating one hundred and fifty-seven dollars.

H. Knittel, for the State, testified that he was the senator from Washington county, Texas, and in February, 1887, was chairman of the senate committee on contingent expenses. As such, it was his duty to examine and verify all accounts for expenses of the senate. The committee investigates and approves the accounts of officers of the senate. The indicted paper being handed to the witness, he stated that he signed it, and approved it for one hundred dollars. He kept an account of accounts approved, and memoranda showing amounts and dates. The account handed him was approved February 11, 1887, for one hundred dollars, but now appears to be for one hundred and fifty dollars. He thought a change had been made in it by making a 5 out of a 0. Defendant presented the account to witness for approval, and witness signed it and delivered it back to the defendant, who presented it to the president of the senate

for approval.  It was for one hundred dollars when approved by witness.

Cross examined, the witness said that all men are liable to make mistakes, but he did not think he made any mistake about this matter.  He positively knew that only one account for one hundred and fifty dollars was approved by him.  He kept a memorandum and was speaking from it.  Without the memorandum, his recollection was not distinct on the subject.  Being asked by the defense to show to the jury any evidence of erasure or change, the witness explained the growth of "0" to "5."  He thought the ink in the hook of the 5 was a little paler.  "The 0 is a little darker than the other."  Witness did not make the change.  A change either in the ink or the pen may have made the difference.  Witness had known the defendant since the civil war, and the latter's reputation for business honesty and truth was good.  Witness was formerly a merchant, and had dealings with the business house of which the defendant was a member.  The dealings were satisfactory.

Re-examined, the witness stated that the change of the 0 to 5 in said instrument was never authorized by him.  The committee on contingent expenses was composed of witness as chairman, and Douglass of Grayson, Garrison, Woodward, Camp and Stinson as members.  Senator Douglass was second on the committee.  Witness transacted the committee business.  Being shown another account for one hundred and fifty dollars, dated March 9, 1887, the witness said that he approved it also for one hundred dollars, and gave it back to the defendant.  It had been raised to one hundred and fifty dollars.  Witness never authorized the change.  "I found it out on next day."  Defendant was sergeant at arms on March 9, 1887.  Witness remembered but one account for one hundred and fifty dollars, and had but one noted in his memorandum book.  That one was dated March 4, and he approved it on that day.  All this occurred in Travis county, Texas, in February and March, 1887.

The witness thought he called the defendant before the committee about ten o'clock on March 10, 1887.  When he came "we" asked him for his books and if he kept any books.  He said he did, and delivered his books right off, without time to change or doctor them.  He gave no explanation of the account of March 9.  At that time the committee had had no final settlement with him.

The account of March 4, 1887, approved for one hundred and

fifty dollars, was shown to and identified by witness. Except that it was for stamps and wrappers only, and bore a different date, its tenor was the same as that of the indicted paper.

On further cross examination the witness was requested to examine the two accounts of February 11 and March 4, and show any difference between them. He replied that they resembled a good deal; and that it was hard to describe the very little difference between them. At the examining court the defendant made a statement about the change in the account of March 9. He never gave any explanation before that. The committee did not ask him for an explanation at its meeting, which was broke up by the meeting of the Senate. Nothing was said in the committee about witness making an affidavit. Witness denied that he declined to make an affidavit until the defendant should be brought before the committee to explain. No charge had been made against the defendant when he was brought before the committee, whose meeting on that occasion was merely for a general overhauling, etc.

The assistant sergeant at arms was named Stewart, and he acted in the several absences of the defendant. Brewer was doorkeeper, but never acted as sergeant at arms, so far as witness remembered.

Again re-examined, the witness stated that the account of March 9 was plainly altered. There was no question of its change, which was more visible than the change in the indicted account of February 11. It was approved on the morning of the day of a committee meeting, held on March 9. On the tenth, about two o'clock, the defendant was before the committee, and was asked if he kept a stamp account, etc. About two hours after that meeting the witness learned of the changed voucher, but did not then tell about it. He discovered it by comparing his own account with that of the postoffice, and finding disagreement between them. He found the voucher in the state treasurer's office.

The prosecution then put in evidence the accounts spoken of by the witness Knittel, viz., the indicted account of March 11, and the accounts dated March 4 and March 9. To the latter two the defense reserved exceptions on several grounds, and among them that they were not contemporaneous with the indicted account, but were too remote therefrom, and were not pecuniary obligations within the statute of forgery.

T. J. Garrison, for the State, testified that he was a senator of

the Twentieth Legislature, and was a member of the committee on contingent expenses of the senate. The account of March 9 being handed to the witness, he said it bore his signature of approval while he was acting as president pro tem. of the senate. He approved it for one hundred dollars and handed it back to the defendant. He saw it in the treasury department the next day, and it had then been changed to one hundred and fifty dollars. He had not authorized the change, and knew nothing about it until found in the treasury department. On the tenth, the defendant was before the committee, but made no mention of this matter. The chairman asked him if he had regular accounts against senators for postal material furnished them, and he replied that he had. In an hour or two thereafter, the witness saw this account of March 9, and it had been raised from one hundred to one hundred and fifty dollars. The chairman of the committee, when present, always acted for the committee, and approved all accounts; and in his absence the next on the committee would act. Senator Douglass was next the chairman. Approvals were made by the chairman of the committee, and then by the lieutenant governor or the president of the senate. Defendant could draw no money on the accounts until they were approved. As to the indicted account of February 11, the witness knew of no change and had authorized none.

Cross examined, the witness said he made a memorandum of the only account he ever approved, and producing his memorandum, it shows that that was an account of the defendant for one hundred dollars.

S. D. Stinson, for the State, testified that he was a senator of the Twentieth Legislature and a member of the committee on contingent expenses, but had never in any capacity acted on the defendant's accounts of February 11 and March 9, which were said to have been altered.

E. G. Douglass, for the State, testified that he was a senator and a member of the senate committee on contingent expenses, but never acted on said accounts of February 11 and March 9, nor had he ever authorized any change in either of them.

W. B. Wortham, for the State, testified that he was chief clerk in the office of the State treasurer. He had seen the defendant's two accounts, dated February 11 and March 9. The account of March 9 was paid by the State treasurer, and witness saw it on the day of its date in the treasury office. The account of February 11 was paid on the day of its date by wit-

ness to the defendant. Witness fixes dates by the papers and indorsements. Previous to the presentation of that account, it was never seen by witness, and when seen by him it was for one hundred and fifty dollars. This was in Travis county, Texas. Witness's initials, "W. B. W." now appear on the paper, but were not on it when presented. He put them on the paper to identify it, and did so on the morning of the twelfth (of March?) when he took it to the comptroller and got a warrant on it. It had been paid irregularly.

Cross examined, the witness stated that, under the ordinary rules and customs of the treasury office, the account did call for money; but, according to law, it was not a claim on the treasury. It was an account against the State, but the regular course of collection required the comptroller's warrant to make it a legal demand upon the treasury.

Frank R. Lubbock, for the State, testified that he was the treasurer of the State of Texas. He had known the defendant for some forty years. Witness did not remember the defendant's account of February 11 (the indicted paper), but as it had been duly approved by the proper officials of the senate, the comptroller could not have refused his warrant on it. The defendant's account of March 9 was presented to witness by the defendant, and witness, his chief clerk being absent, paid it to defendant about one o'clock of March 9. The treasurer is not bound to pay without the comptroller's warrant; but, when the legislature is in session, it is a great convenience to the comptroller and treasurer to take up the accounts and at night aggregate them into one warrant. It had been the custom in the treasurer's office to pay such accounts, and witness paid this one of March 9, to the defendant, who made no remark about any change in it, and witness supposed it to be now in the same condition as when he paid it. Witness paid defendant one hundred and fifty dollars, and would not have paid him more than the account called for on its face.

Cross examined, the witness said he considered the account to be as good as a warrant. It is his habit to accommodate everybody when he can. The fifty dollars (evidently alluding to the "raise" in the account) had been paid back to him. The defendant's character for truth and honesty was good, and this was the first transaction impeaching it, so far as witness ever knew.

Re-examined, the witness said that he was repaid the fifty dollars by collecting for defendant a claim for his services

amounting to fifty-five dollars, out of which he retained fifty dollars, and paid the remaining five to defendant's attorney.

H. Knittel, recalled by the State, testified that he was in Austin on the eighth, ninth and tenth of March, 1887. On the evening of the ninth he was at the hotel. On February 11, 1887, he was in Austin, and on duty in the senate.

The State next introduced a voluntary statement made by the defendant before Justice of the Peace Calhoun, after being cautioned as directed by law. It bears no date, but its contents show that it was made on March 10, 1887, and that it relates to his account of March 9. It reads as follows:

"Last Saturday evening I got a leave of absence to visit my family in Galveston. I left Mr. Brewer to act for me till my return. I turned over to him, I think, $18.00 worth of stamps and wrappers. I told him I thought that would do until my return. They only lasted him about one and a half days, and he borrowed $15.50, which made a little over $35.00. On my return I got short and had to buy stamps and pay this debt, and I made out an order for $100.00, which was approved by Mr. Knittel, chairman of the contingent fund committee, and also Senator Garrison, acting president. In looking over my books I found that the Senate owed me a little over $50.00, in addition to the money, $15.50. I found that I wanted & needed about $35.00 worth of stamps. I had been in the habit of advancing money out of my own pocket, as I could get it at any time by making out the order. I discovered, after getting it approved, that I needed more money than I had given the order for. I went to find Knittel, but could not find him, as I wanted to change the order and make it $150.00 instead of $100.00; not finding him, I changed to $150.00  That was on the 9th inst., yesterday, and on the same day charged myself with $150.00, instead of $100.00 as originally, and at this present time the books will show that the stamps I purchase this week is not credited up on the credit side, as I am in the habit of crediting it up on Sundays, and as it stands now they are indebted to me. I can not exactly tell the amount. I will state that it was not with the intention of fraud that I made the change. The Treasurer was about to close and I could not find the chairman.

"P. H. HENNESSY."

Next after the "statement" of the defendant, the transcript

devotes more than thirty of its pages to a mass of oral and documentary evidence introduced by the State and largely objected to by the defense. The oral evidence comprises the testimony of officials and clerks of the Austin postoffice and clerks, pages and employes of the senate, etc. The documentary evidence consists of postoffice accounts against the defendant as sergeant at arms of the senate, accounts of the defendant against the senate, and extracts from the defendant's account book, showing the amount and value of stamps and postal stationery furnished by him to each senator, etc.; and in connection with this documentary proof, the State introduced testimony to show numerous augmentations of the accounts by alterations of figures. Part of the objections taken by the defense to the evidence of alterations was that the qualification of the witnesses as experts in handwriting was not shown. Exception was also reserved by the defense to the manner in which the State's attorney put the accounts and book entries before the jury, by comparison of the one class with the other in a mode claimed by the defense to be argumentative.

H. Knittel was recalled by the State and examined with reference to the account book of the defendant. The witness identified the account book in evidence as the book delivered to him by the defendant in the committee room on March 10, 1887. Defendant stated that it contained his accounts, but did not say who kept it. Certain vouchers were handed to and identified by the witness as vouchers handed him by the defendant at the same time the account book was delivered. In reply to a question of the defense the witness, upon his cross examination and after making calculations from the defendant's account book, stated that defendant was charged with one thousand and seven dollars, and his account book showed that he had furnished postoffice material to the amount of eight hundred and forty-six dollars. His own account, however, as set out in the record, shows his disbursements to aggregate nine hundred and forty-five dollars and fifty-six cents.

J. A. Stewart, for the State, testified that he was the assistant sergeant at arms for the senate of the Twentieth Legislature. Defendant was the principal. After the second week of the session of 1887, witness had nothing to do with the defendant's papers, except that on one occasion when both the defendant and Brewer, the doorkeeper, were absent, he took charge of the stamps, and accounted therefor to defendant on the latter's re-

turn.  Witness kept the accounts for the first two weeks of the session, and the account book in evidence was bought by him for the purpose of keeping the accounts.  At the close of the second week, on January 23, he posted the account book for the last time.  For the first two weeks he kept accounts with al senators who wanted stamps, etc., during that time.

Witness's attention being called to the book account against Senator Gregg for the first week, of four dollars and eighty cents, and for the second week, of four dollars and seventy-five cents, he said those were not the amounts entered by him, which, respectively, were one dollar and eighty cents and one dollar and seventy-five cents ; the figure 4 having since been made in both instances out of the figure 1 as written by him. The witness designated similar changes made in the book accounts against more than twenty of the senators.  He entered all charges that he knew of during the first two weeks, of which he was speaking.  Defendant sold but little postal material during those two weeks, and what he sold during that period was included in the entries made by witness on the account book.  Witness knew of no person besides himself and the defendant selling any stamps.

Cross examined, the witness stated that the pages had no power to take stamps in the defendant's absence.  When asked why he did not act as sergeant at arms in the absence of the defendant, the witness replied that he did so except when he was otherwise ordered.  "I was only at desk temporarily.  He and Claiborne asked me temporarily to get up the necessary stationery.  He relieved me of the desk and told me to take my place in the lobby."  Witness could not say that he knew the defendant's hand writing or had ever seen him write.  He did not know of the defendant's advancing money the first few days, but knew that several days elapsed before the appropriation bill was passed.  Defendant always got stamps, etc., and witness would credit him with them.  Witness could not say that he was an expert, but the changes he had spoken of were very apparent.

The defense reserved exceptions to this witness's testimony about changes in the entries, on the ground that he did not qualify himself as an expert.

W. P. Brewer testified that he was assistant doorkeeper of the senate during the early part of the legislative session.  He had access to the stamps and wrappers a few times.  Certain

papers being shown to the witness he said that he had never seen them before, nor had the defendant ever told him of them. Witness knew nothing of the defendant's desk, "only when in his absence several times he left the key with me."

Cross examined the witness stated that the defendant, "just before the trouble," gave him stamps, etc., amounting, by defendant's count, to eighteen dollars and eighty-seven cents. The defendant left after adjournment on Saturday, and returned the following Wednesday. 'Witness "set out stamps" on the intervening Sunday, Monday and Tuesday, while defendant was absent. In the defendant's absence witness had to borrow five dollars from Senator Knittel, besides using ten dollars of his own money. But very few stamps were on hand when the defendant returned. Witness was in the senate chamber every day, and, at defendant's request, had the key two or three Sundays. He did not know defendant's hand writing.

William Imboden, for the State, testified that he was journal clerk of the senate. On the day the defendant was before the committee which was examining charges, the witness heard him say that he kept his own books.

Cross examined, the witness said he knew that employes used stamps. He got stamps himself, and he saw Johnson get stamps and have them charged to Senator Davis. The stamps got by witness were charged to Senator Houston. He remembered getting fifty and thirty, and altogether he probably got a dollar and fifty cents worth. He also got wrappers. "Both times I got them from defendant; in fact every time from defendant, except once from Stewart." In the absence of defendant, Brewer was generally in charge, but Stewart was in charge early in the session. Defendant went home about every second Saturday. He seemed to be rather particular about postage, and kept his desk closed. Witness had seen senators go to get stamps, and could not, unless defendant had left his key. "He appeared quite careful."

Frank Lewis, for the State, testified that he was one of the four porters of the senate, the others being Brooks, Chambers, and Andrew Columbus. Defendant would send others beside the pages for wrappers. Columbus brought some, and at times the witness would take up from five to ten boxes. Witness got to Austin the night previous to his examination. Defendant requested witness to be present at his trial, and said that he was to be tried, and wanted witness here. The witness acknowledged

telling the State's counsel that the most he ever took up were four or five boxes, but, on thinking the matter over, he remembered that he brought ten boxes at one time. He carried five of them and another boy five.

Cross examined, the witness remembered seeing defendant give money to a page one night the Galveston delegation were present in his room. Witness was opening wine at the time. Defendant, besides other money, handed the page a twenty dollar bill, and told him to get fifty-five dollars worth. Witness did not know that the money amounted to fifty-five dollars, nor whether "the postage were gotten." He knew of no other sums being handed to pages, but once saw defendant give money to Andrew Columbus, though he could not say how much. Witness remembered but one Saturday night that the defendant failed to go to Galveston. Brewer was in charge when defendant was gone, but did not occupy the latter's room. Pages often got stamps when the defendant was at his dinner. Defendant was very careless; he would leave his key in his desk, and his pocket book and spectacles everywhere around.

Re-examined, the witness could not tell to which of the pages the money was given by the defendant.

Robert Morris, Jim Carlisle, Lee Walker and Oliver Jones (the four pages of the senate), were sworn for the State, and each denied that he, in the presence of the preceding witness, Frank Lewis, ever received from the defendant such instructions or money as Lewis had testified to.

The State closed.

The first witness for the defense was Senator Davis, who stated that during the first month of the session of the senate there were mailed reports, etc., from departments, Governor's messages, etc. The Texas boundary commission report was the heaviest package he remembered. He knew of packages having been sent back for want of sufficient postage. He never knew of any one getting stamps on his credit, but had been told by Imboden that such was the case. He had known the defendant most of the time since the war, and this was the first charge he ever heard against him.

Cross examined, the witness could not tell whether his postage account was correct or not.

W. Imboden, for the defense, stated that of Governor Ireland's message ten thousand copies were furnished; of Governor Ross's message, nine thousand copies; and of the inaugural address

three thousand copies; and he thought these were mailed in the first of the session. He had no idea how many copies of the reports, etc., were sent off.

Cross examined, the witness said that a great many of the documents were "there yet." He had no idea a third of them were mailed. A large quantity of them are stacked up, and two or three windows are filled with them. Whenever anybody wanted them he went and got them.

Committee Clerk Flint testified that he got stamps and wrappers, and they were charged to Senator Harrison. He did not think they amounted to as much as one dollar and fifty cents a month.

Mr. Hill, a photographer, testified that he had lately photographed some papers for the defendant's counsel. Speaking of one of them (presumably the indicted account), the witness said that he saw no evidence of a change either in the original or the photographic copy.

Cross examined, he said he did not swear there had been no change, but only that he saw none. As to the difference of color between the 5 and the other figures, he thought that might be attributable to the quantity of ink. The photograph copy was offered in evidence.

A number of witnesses established for the defendant an unimpeached character for honesty prior to this prosecution.

*Walton, Hill & Walton*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. We perceive no abuse of the discretion of the trial judge in refusing defendant's application for a continuance. As to the witness Israel, requisite diligence to obtain his testimony is not shown. The indictment was returned into court March 17, 1887. Defendant was already under bond, taken before an examining court, to answer this charge should the grand jury present an indictment therefor against him. He states that as soon as he learned that an indictment had been presented against him he appeared before the court and entered into a recognizance, but we are not informed by said application of the exact date when he entered into said recognizance. At the time of entering into said recognizance the cause was set for trial on April 20, 1887, more than one month after the presentment of the

indictment. It was not until April 9, 1887, that defendant had an attachment issued and forwarded to Harrison county, Texas, for said witness Israel, that being the county of said witness's residence. It appears upon the return of said attachment that, before it reached the hands of the sheriff of that county, said witness had removed from the county and the State to Washington City, D. C. It does not appear from the application when said witness left Harrison county, or that service of an attachment might not have been had upon him if such process had been applied for and forwarded to said county promptly, nor is it made to appear that by the use of diligence the testimony by deposition of said witness could not have been obtained in time for the trial.

As to the other absent witnesses, one of them, Lewis, was present and testified on the trial, and the facts expected to be proved by the others can not be regarded as material when considered with reference to the evidence adduced on the trial. We can not perceive in what respect, even in the remotest degree, it would affect any issue in the case, or would throw any light upon the transaction, to prove by these witnesses, Senators Claiborne, Upshaw, McManus and Houston, that they actually received from the defendant the amount of postage material charged to them. This was not an issue in the case. It was not shown, or proposed or attempted to be shown, by the prosecution that the defendant had charged up in his account book against these senators any more postage material than they had actually received from him. If it had been proved that his transactions with them had been perfectly fair and honest on his part, this fact would not even tend to prove that he did not falsify his accounts with other senators. The fact that a man has not swindled, committed perjury, theft, or other crime in one or more instances when opportunities presented, is neither admissible nor material to disprove guilt of a crime with which he is charged and on trial.

II. A careful inspection of the original indictment sent up with the record satisfies us that the alleged forged instrument is correctly copied into the indictment, and that there is no variance between the indictment and said instrument. In writing the name "Knittel" in the indictment, in setting forth the instrument as it appeared after alteration, the pleader has dotted one prong of the letter "n" instead of placing the dot directly over the letter "i." The letters forming the word "Knittel" are, however, plainly and distinctly written, and the mere misplacement

23 — TEX. APP. XXIII.

of the dot intended for the letter "i" certainly can not be held to constitute a variance.

It is alleged in the indictment that the alleged forged instrument was approved by "H Knittel chairman of the Committee on contingent expenses of the Senate," etc. An inspection of the instrument shows that it was signed "H Knittel Chairman, on Com Contg Exp." We see no variance. It was a question of fact as to whether the signature of Knittel was an approval of the claim, as alleged. As to the letters "W. B. W.," appearing on the face of the alleged forged instrument, the proof showed that they were placed there after the alleged alteration of said instrument, and were therefore not a part of said instrument or of its description, and were properly omitted from the indictment. (Labbaite v. The State, 6 Texas Ct. App., 257; May v. The State, 15 Texas Ct. App., 430.) There was no error in admitting the alleged forged instrument in evidence.

III. There was no error in admitting in evidence the post-office receipts, and in admitting evidence tending to show that the said receipts had been altered by the defendant. It was sufficiently proved that these papers were made by the defendant, and it was for the jury to determine from the evidence whether they had been fraudulently made or altered by him. If fraudulently made or altered by him, they offered legitimate evidence tending to prove a fraudulent intent on his part in altering, if he did alter, the instrument upon which this indictment is based. That they are not papers of contemporaneous date with the alleged forged paper, is not a valid objection to them. It was the object of the prosecution by this collateral evidence to show a system of fraudulent acts on the part of the defendant to obtain money from the State to which he was not entitled, and thus to show that in the alteration of the particular instrument he was actuated by such fraudulent intent. "When the object is to show system, subsequent as well as prior offenses, when tending to establish identity or intent, can be put in evidence. The question is one of induction, and the larger the the number of consistent facts, the more complete the induction is. The time of the collateral inculpatory facts is immaterial provided they be close enough together to indicate that they are part of a system." (Whart. Crim. Ev., sec. 38. See also subsequent sections of same chapter.) Nor do we agree to the proposition urged by counsel for the defendant that these receipts are not such documents as would afford the basis of forgery. We

think they are "pecuniary obligations" within the meaning of our statute upon forgery. (Dooley v. The State, 21 Texas Ct. App., 549; Morris v. The State, 17 Texas Ct. App., 660.) With reference to this testimony, the court plainly and emphatically instructed the jury that it could be considered for one purpose only, and that purpose was to throw light upon the defendant's intent in making the alteration charged, if he did make the alteration, and that said testimony did not and would not be considered as affecting in any way the question whether he altered the instrument set out in the indictment.

IV. The testimony of the witness Carr was relevant, and properly admitted. It tended to prove that defendant had not purchased and distributed the amount of postal material charged in his accounts, and thereby tended to prove the falsity of his accounts and his fraudulent intent in the several transactions, forming a system of frauds of which the forgery charged was a part.

V. The manner of introducing evidence is very largely within the discretion of the trial judge to control and regulate, and, it not appearing to us that this discretion was abused by the learned judge who presided at the trial of this cause, we shall not revise the matters complained of in defendant's bills of exception seven and eight.

VI. But one exception is made to the charge of the court, and this relates to paragraphs as to reasonable doubt and circumstantial evidence. We confess that we are unable to comprehend the objection, or rather the force and soundness of it. In the respects complained of, as in all others, we regard the charge as a model one, and not subject to criticism.

VII. It is not made to appear that the court erred in overruling defendant's motion to quash and set aside the list of jurors presented him. We are not informed by the bill of exceptions relating to this matter what the facts were concerning the grounds of said motion. By signing and allowing the said bill the judge did not establish the truth of the grounds set forth in said motion, but simply certified that such a motion had been presented to him for action, and that he had overruled it. In this state of the case we must presume that the objections urged to the list of jurors were not sustained by the facts.

VIII. We have given attention to every supposed error pointed out by the defendant's counsel, and have made a careful examination of the voluminous record. We must say that

in our judgment, the defendant has had a fair and impartial trial in strict accordance with law, and that there is no error in the conviction. As to the evidence of his guilt, it is amply sufficient. It develops a series of systematic frauds committed by the defendant, deliberately and ingeniously, for the purpose of obtaining from the State money to which he was not entitled. No room for doubt as to the commission of the forgery of which he stands convicted is left by the evidence. It conclusively establishes the act, and the fraudulent intent which accompanied and impelled it.

The judgment is affirmed.

*Affirmed.*